[No. A075385. First Dist., Div. Four. Jan. 7, 1999.]

KENNETH VALENTINE, Individually and as Successor in Interest, etc., Plaintiff and Appellant, v. BAXTER HEALTHCARE CORPORATION et al., Defendants and Respondents.

**[Opinion certified for partial publication.*]**

*Part II.E. through H. of this opinion is not certified for publication. (See Cal. Rules of Court, rules 976(b) and 976.1.)

1468

1470

**COUNSEL**

Liccardo, Rossi, Sturges & McNeil, Salvador A. Liccardo and Laura Liccardo for Plaintiff and Appellant.

Brobeck, Phlegar & Harrison, Debra E. Pole, Christopher J. Menjou, Thomas M. Peterson; Rodarte, Geringer & Kamel and Daniel D. Rodarte for Defendants and Respondents.

**OPINION**

**REARDON, J.**—This product liability case against the manufacturer of silicone gel breast implants has been twice tried. The first jury returned

special verdicts for the defense on strict liability and fraud, but hung on the causation element of the negligence count. (Valentine I.) The second jury returned a special verdict for the defense on negligent design and manufacturing, but deadlocked on negligent failure to warn and hung on the causation element of the negligent testing and inspection count. (Valentine II.)

Several questions never before decided emerge: Did the court presiding over the first trial have the power to accept special verdicts on some causes of actions, reserve judgment until termination of the entire action, declare a mistrial as to the remaining causes of action and then order a limited retrial? Did the defense verdict in the first trial on strict liability failure to warn subsume the cause of action for negligent failure to warn so that the court presiding over the second trial was within its authority to direct a defense judgment on that negligence count? Did that court also correctly direct a defense judgment on negligent testing and inspection upon concluding that a failure to test or inspect, standing alone, cannot cause injury? In the published portion of this opinion, we resolve that the trial court was within the law and its authority on these matters. Concluding that no prejudicial errors were committed with respect to other matters, we affirm the judgment.

## I. FACTS

### A. *Facts Concerning Mrs. Valentine*

In early 1975, after the birth of her son, Mildred Valentine (Mrs. Valentine)[1] consulted Dr. Foster about having a "breast lift" or maximum mastopexy. Dr. Foster explained that the procedure would involve hospitalization, general anesthesia and two to three incisions in each breast. Dr. Foster also informed Mrs. Valentine of the alternative of the silicone breast implant, performed in the office with local anesthesia.

Dr. Foster advised Mrs. Valentine about the risks attendant to the implant procedure, including infection, contracture, hematoma and numbness. He never told her that implants were perfectly safe. Nor did Dr. Foster refer to any risk that the gel could migrate or bleed out into the body. However, at that time he had no knowledge of the concept of gel bleeding or migration, other than upon rupture of the implant. Dr. Foster has always kept abreast of the literature and developments in the area of plastic surgery, primarily by reading journals and attending continuing education seminars and conventions. During the time he treated Mrs. Valentine, he never came across any information that silicone implants caused systemic illness.

---

[1]Mrs. Valentine died after initiating this appeal. Kenneth Valentine, her husband, now prosecutes individually and as successor in interest to his wife.

On January 22, 1975, Mrs. Valentine underwent the augmentation surgery with silicone breast implants manufactured by Heyer-Schulte Corporation (Heyer-Schulte). Shortly thereafter, she developed one of the complications Dr. Foster warned about—capsular contracture in the left breast. Dr. Foster performed an open capsulotomy procedure in March 1975. This entailed removing the implant, dividing the scar tissue and inserting a new implant. To reduce further contracture, Dr. Foster injected cortisone into the left breast pocket; a week later he injected an antibiotic into the pocket to eliminate a staph infection.

Nevertheless, contracture returned to the left side. This time Dr. Foster performed a closed capsulotomy, squeezing the breast to rupture the excess scar tissue. Four years later he again performed a closed capsulotomy, once on both sides, and a month later on one side.

Mrs. Valentine was diagnosed with lupus[2] around 1976.

Dr. Rizk, a pulmonary care specialist, began treating her in 1991. Due to the severity of her lung disease, Dr. Rizk decided the breast implants should be removed and on August 18, 1992, Dr. Ramos, a plastic surgeon, performed the exploration. He reported that the implant shells were intact—not ruptured. There was no evidence of silicone outside the scar capsule, and no tissue or defects associated with the implants. When he opened the scar capsule to remove the implant, Dr. Ramos did observe some sticky gel material on the outside of the implant. Although he assumed the material would come in contact with the inside of the scar capsule, he did not see any silicone anywhere else and did not think a tissue biopsy was necessary.

Nonetheless, in December 1995[3] appellant underwent a magnetic resonance imaging (MRI) scan to determine if there was any silicone left behind after the implants were removed. Dr. Middleton performed the MRI. He found a granuloma, a "silicone soaked scar, a massive tissue which has silicone all through it . . . ." However, Dr. Middleton was not sure if the granuloma was located just outside, or outside and separated from, the capsule. In January 1996 Dr. Emery removed the granuloma. He described the location as in the capsule and resting up against the pectoral muscle but not penetrating the muscle. Dr. Emery sent the specimen to Dr. Ortega, a pathologist, for analysis. Analyzing the granuloma specimen, Dr. Ortega

[2]Lupus, or "systemic lupus erythematosus" is an autoimmune disease in which the body turns "against itself" by producing antinuclear antibodies. Characteristic manifestations of the disease include skin rashes, sensitivity to sun, hair loss, joint pain, stiffness, pleurisy, kidney involvement, nervous system involvement, lung involvement and involvement of the gastrointestinal tract.

[3]This occurred after the conclusion of the first trial.

diagnosed a foreign body reaction consistent with the presence of silicone and typical of what is seen in women with silicone breast implants. The granuloma was attached to the capsule or scar tissue; it was not attached to the muscle tissue, and there was no evidence of silica.[4]

Experts at both trials testified that: (1) Mrs. Valentine had lupus; (2) lupus is appreciably more common in women (particularly young women) than men and more common in African-American women (Mrs. Valentine was African-American); (3) Mrs. Valentine suffered symptoms of lupus before undergoing the implant process; (4) the epidemiological studies indicate there is no causal relationship between breast implants and autoimmune diseases such as lupus;[5] and (5) Mrs. Valentine's symptoms did not improve significantly upon removal of the implants.

B.  *Facts Concerning Heyer-Schulte*

Heyer-Schulte was formed in 1962.[6] It manufactured a variety of silicone products for implantation in humans, including hydrocephalic shunts, penile prostheses, kidney shunts, and urethral stents, as well as custom devices. The quality assurance department answered directly to the president, not to the production unit. The company had a quality assurance program for raw materials as well as finished goods, with various checks at different phases of the manufacturing process. For example, Heyer-Schulte quarantined the raw silicone components upon receipt from the supplier, and then, as to each batch, tested the physical properties of the raw material to determine if it conformed with vendor specifications. In particular, the incoming silicone gel materials were tested to determine the proper ratio between the components in order to attain the proper gel consistency. As well, tests for acute toxicity were conducted by outside contractors. Upon receipt of certification on the toxicity tests, the raw materials were released to production.

The mix ratio was then set on the mixer machine, the components were added and a sample was taken and run through curing to determine if the proper consistency was actually being delivered. Periodically, during the process of filling the shells, samples were taken and cured to again ensure

---

[4]Dr. Ortega explained that silica can be either easy or difficult to see, and does not pick up the dye.

[5]For example, Dr. Michael Phillips, with a specialty in immunology, reviewed some 30 to 35 epidemiological studies. He concluded there was no increased incidence of connective tissue disorders or autoimmune disease in women with breast implants versus those without. Moreover, there was an unanimous agreement among the investigators that there was no risk with regard to lupus.

[6]American Hospital Supply Corporation acquired Heyer-Schulte in 1974 and sold the breast implant division in 1984. Later, American Hospital Supply merged with respondent Baxter Healthcare Corporation (Baxter).

proper consistency. Finally, the prostheses produced on a given day were oven cured and destructive testing was performed on implants from each lot to verify proper curing.

## C. *Facts Concerning Silicone Polymer and Silicone Gel Implants*

Silicone polymer, used in the Heyer-Schulte breast implants, is a stable material that will not degrade unless exposed to extreme temperatures, very strong acid or a strong base with critical heat. It resists migration through an aqueous environment such as the human body. Silicone polymer was first used medically during World War II for treatment of burns and gastrointestinal wounds.

Silicone gel will not degrade into silica under any conditions present in the body's breast cavity. However, all silicone gel-filled breast implants will bleed microscopic amounts of silicone to the outside of the elastomer shell. But even the microscopic quantities of gel bleed do not degrade into silica.

There was a substantial body of scientific and medical literature published between 1948 and 1974 on silicone as a biomaterial.[7] These studies covered different animal species, different routes of administration, different forms of silicone (e.g., fluid, resin), and effects on various body functions. By January 1975, there was sufficient knowledge of silicone as a biomaterial such that it was reasonable for a manufacturer of medical devices to conclude silicone was safe to use for human implants.

This pre-1975 research confirmed that silicone in the body caused only a localized foreign body reaction. There was no evidence that silicone caused systemic ill effects.

By 1975 the medical community had 10 years of clinical experience with silicone gel breast implants. As of that time there were no reports of systemic disease in implanted patients. The first case report of implanted patients with any systemic disease was published in 1982 describing three women who coincidentally developed autoimmune connective tissue disorders after implantation. By the time of the second trial in this case, over 30 controlled epidemiological studies had been conducted, none showing a statistically significant risk of systemic disease in the breast-implanted population.

## D. *Procedural History*

In June 1992 Mrs. Valentine and her husband sued Heyer-Schulte, Baxter and others for personal injuries caused by the silicone breast implants. Twice the case went to a jury.

---

[7] A biomaterial is a substance put into the body to substitute for natural body tissue.

At the close of the first trial, the jury returned defense verdicts on strict liability (failure to warn or manufacturing defect) and fraud. As to negligence, the jury found Baxter was "negligent in failing to exercise reasonable care in the design, manufacture, testing or inspection of the product or in failure to adequately warn," but hung on the issue of causation. The trial court found that the several causes of action were severable, entered "interlocutory judgment" in favor of Baxter on the fraud and strict liability causes, but declared a partial mistrial on the negligence cause.

The issues of negligence in the design and manufacture of the implants as well as negligent failure to warn were submitted to the second jury. It determined Baxter was not negligent in designing or manufacturing the implants, but after seven days of deliberation the jury was unable to reach a verdict on negligent failure to warn. At this juncture, at the request of plaintiffs' counsel, the court added a question to the special verdict form: "Were the Defendants. negligent in failing to exercise reasonable care in testing and inspecting Plaintiff's breast implants?"

The jury remained at impasse on negligent failure to warn. Although it voted nine to three that Baxter was negligent in testing or inspecting, it split eight to four on causation. The court declared a mistrial. Subsequently, on Baxter's motion, the court directed entry of judgment in favor of Baxter as a matter of law on these causes of action. This appeal followed denial of the Valentines' motion for new trial.

## II. Discussion

### A. *The First Trial Court Properly Declared a Partial Mistrial, Reserved Judgment on Some Causes of Action and Ordered Partial Retrial*

■ Can a trial court declare a partial mistrial and reserve judgment on some, but not all, causes of action pending a second trial? This issue has never been resolved by an appellate court of this state. The answer is: "Yes, it can."

We begin by surveying the myriad procedural devices that vest trial courts with authority to partially resolve issues in cases before them. (See discussion, *Beavers* v. *Allstate Ins. Co.* (1990) 225 Cal.App.3d 310, 324-325 [274 Cal.Rptr. 766].) First, at the pretrial stage a court can eliminate causes of action and defenses on demurrer and through motions for summary judgment or adjudication. (Code Civ. Proc.,[8] §§ 430.50, 437c, subd. (f).) A trial court can also bifurcate the trial for discrete resolution of special defenses or any issue or part of an issue. (§§ 597, 597.5, 598.)

---

[8]Unless otherwise stated, all statutory references are to the Code of Civil Procedure.

During trial a court can grant a nonsuit in a defendant's favor as to some or all of the issues involved in the action. (§ 581c, subd. (b).) As with the · directed verdict (see below), if the partial nonsuit is granted, final judgment is postponed until termination of the action at which time judgment is awarded as determined by any matters in the trial as well as by the order for nonsuit. (*Ibid.*) Similarly, in a court trial after a party has completed presentation of evidence, the court can grant a motion for judgment as to some but not all of the issues in the action. (§ 631.8, subd. (b).) Again, the final judgment shall reflect matters resolved by the motion as well as any matters determined in the trial. (*Ibid.*)

The court likewise has discretion to direct the jury to find a special verdict[9] upon all, or any of the issues. (§ 625.) Section 628 provides in relevant part: "[U]pon receipt of a verdict, an entry must be made in the minutes of the court, specifying the time of trial, the names of the jurors and witnesses, and setting out the verdict at length; and where special verdict is found, either the judgment rendered thereon, or if the case be reserved for argument or further consideration, the order thus reserving it."

Posttrial, a court may grant a directed verdict as to some or all of the issues. (§ 630, subd. (b).) In the event of a partial directed verdict, "no final judgment shall be entered prior to the termination of the action, but the final judgment, in addition to any matter determined in the trial, shall reflect the verdict ordered by the court as determined by the motion for directed verdict." (*Ibid.*) If the jury has been discharged without rendering a verdict, the court, on its own motion or upon motion of a party, can direct judgment in favor of a party where a directed verdict would have been proper. (*Id.*, subd. (f).)

A court can also render judgment notwithstanding the verdict whenever a motion for directed verdict should have been granted had such a motion been made. (§ 629.) This authority includes the authority to grant a partial judgment notwithstanding the verdict, since the court can grant a directed verdict as to some, but not all, of the issues. (*Beavers* v. *Allstate Ins. Co.*, *supra*, 225 Cal.App.3d at pp. 322, 323.)

Finally, a trial court can grant a new trial on all or part of the issues (§ 662) and, on appeal, an appellate court can reverse the judgment on some or all of the issues. The appellate court may also order a retrial on a limited

---

[9]A special verdict is "that by which the jury find[s] the facts only, leaving the judgment to the Court. The special verdict must present the conclusions of fact as established by the evidence, and not the evidence to prove them; and those conclusions of fact must be so presented as that nothing shall remain to the Court but to draw from them conclusions of law." (§ 624.)

issue (*Brewer* v. *Second Baptist Church* (1948) 32 Cal.2d 791, 801 [197 P.2d 713]), or order that a different judgment be entered on a limited issue (*Noack* v. *Zellerbach* (1936) 14 Cal.App.2d 249, 251-252 [57 P.2d 1390]).

As explained in *Beavers*, since 1965 the Legislature has consistently expanded the trial court's ability to partially resolve the issues before it. (*Beavers* v. *Allstate Ins. Co.*, *supra*, 225 Cal.App.3d at pp. 324-328.) And, where appellate courts expressed concern that, for example, the one final judgment rule would be violated by granting partial nonsuits (see *Estate of Jamison* (1953) 41 Cal.2d 1, 5-6 [256 P.2d 984]), the Legislature stepped in, decreeing that despite granting the nonsuit motion, final judgment could not be entered until termination of the action (§ 581c, subd. (b), as amended by Stats. 1980, ch. 187, § 1, p. 409). Similarly, the Legislature has provided the means to satisfy the one final judgment rule while simultaneously allowing partial resolution of issues in the case of motions for judgment in a court trial (§ 631.8, subd. (b), as amended by Stats. 1980, ch. 187, § 2, p. 410) and motions for directed verdict (§ 630, subd. (b), as amended by Stats. 1986, ch. 540, § 12, p. 1936). Where the Legislature has not closed the gap between partial resolution of issues and the one final judgment rule, reviewing courts have. (See *Horton* v. *Jones* (1972) 26 Cal.App.3d 952, 956-957, 959 [103 Cal.Rptr. 399], and discussion thereof in *Beavers* v. *Allstate Ins. Co.*, *supra*, 225 Cal.App.3d at p. 326 [Defendant found liable in first phase of bifurcated trial pursuant to section 598 moved unsuccessfully for judgment notwithstanding the verdict and attempted an appeal before trial of the damages phase. The reviewing court held that an interim appeal would defeat the purpose of bifurcated proceedings. Thus, after the first stage of a bifurcated proceeding, the trial court should enter a minute order but not a judgment, then proceed with trial of the remaining issues, with entry of final judgment awaiting terminating of the action].)

Although the power of the trial court to direct the jury to find a special verdict is not completely analogous to its power to direct a verdict or grant a nonsuit or a motion for judgment notwithstanding the verdict, it is similar. The court can direct the jury to find a special verdict "upon all, or any of the issues"—thus, the statutory scheme contemplates a partial special verdict. (§ 625.) Upon receipt of a special verdict and entry in the court minutes, the court can render judgment thereon where appropriate or order the special verdict reserved, with the case proceeding for argument or further consideration. (§ 628.) This procedural device is not inconsistent with accepting and reserving the special verdict[10] on discrete causes of action, then proceeding with retrial as to remaining causes of action on which the jury hung.

---

[10]Here the court entered an "interlocutory" judgment. Historically the "interlocutory" label has connoted a provisional judgment subject to modification by the court after further

We must point out, however, that here the court initially directed special verdicts on *all* the issues. It was not until the court learned that the jury had answered all questions but one and could not agree on it, that it directed the jury to sign and return the partial verdict on causes of action upon which it did reach resolution. That verdict indicated that the jury had determined all conclusions of fact pertaining to the strict liability and fraud causes of action. The court then accepted and entered those verdicts. Nothing remained but for it to draw the legal conclusion of nonliability as to Baxter on those counts. (§ 624.) The court's power to proceed in this matter was not outside the scope of sections 625 and 628 permitting direction to find a special verdict on *some* of the issues, and receiving and entering that verdict in the minutes as the conclusive adjudication of those causes of action pending entry of final judgment upon termination of the case after retrial. Indeed, in *Phelps* v. *Superior Court* (1982) 136 Cal.App.3d 802, 814 [186 Cal.Rptr. 626], the reviewing court validated separate special verdicts which the jury returned on certain issues even though remaining special verdicts were not properly determined, thus necessitating retrial of those issues.

The question becomes, then, whether the causes of action subject to the special verdicts were, as the court ruled, severable such that the negligence cause could be separately retried. They were.

There is no constitutional impediment to a retrial of a limited issue, so long as that issue is sufficiently distinct and severable from the others that a limited retrial would not result in an injustice. (*Gasoline Prods. Co.* v. *Champlin Co.* (1931) 283 U.S. 494, 499-500 [51 S.Ct. 513, 514-515, 75 L.Ed. 1188]; *Brewer* v. *Second Baptist Church, supra,* 32 Cal.2d at p. 801.) And, where special verdicts on one matter do not depend on inconclusive special verdicts on another matter, the remaining matter can properly be determined on retrial. (See *Phelps* v. *Superior Court, supra,* 136 Cal.App.3d at pp. 814-815 [comparative negligence special verdicts were not dependent upon determination of special verdicts on punitive damages, which were inconclusive; thus issues concerning punitive damages could be separately submitted for retrial].)

The trial court correctly ruled that negligence was separate and severable from the independent causes of action for strict liability and fraud. It was

evidence or consideration of the law. (See *Travelers Ins. Co.* v. *Superior Court* (1977) 65 Cal.App.3d 751, 760 [135 Cal.Rptr. 579].) In other words, this concept of interlocutory judgment leaves room for judicial reconsideration. But the court's action here left no room for reconsideration. On the contrary, the acceptance of partial verdicts and entry of "interlocutory judgment" had the same effect as entry of an order on a motion for partial nonsuit, directed verdict or judgment notwithstanding the verdict, while holding in abeyance the final judgment until termination of the action, in this case, upon termination of the retrial. What the partial special verdicts disposed of was not open to reconsideration at the trial court level, and hence there was no interlocutory judgment in the traditional sense.

separately pled, separately covered on the verdict form, and subject to separate instructions. Negligence and strict liability form independent bases of liability. Appellant cites *Hasson* v. *Ford Motor Co.* (1977) 19 Cal.3d 530 [138 Cal.Rptr. 705, 564 P.2d 857, 99 A.L.R.3d 158] for the proposition that a plaintiff "forced" to retry a negligence count should be allowed to pursue again the strict liability count. There, the jury specially found there was no defect in the subject vehicle at the time it was manufactured and sold, but that both the manufacturer and servicing dealer had been negligent. However, the trial court did not instruct on contributory negligence. The Supreme Court reversed for failure to deliver contributory negligence instructions and further stated: "Considerations of fairness also convince us that [plaintiff] should not be precluded from again pursuing his strict liability theory. . . . [W]e cannot say, upon this record, that the jury clearly reached a conclusion that any basis of strict liability was lacking; moreover, this strict liability theory is closely linked with that of negligence on the basis of the evidence adduced. Further, the similarity of evidence on the alternative theories at the first trial persuades us that no significant judicial time would be saved by precluding assertion of a strict liability count on retrial." (*Id.* at p. 553.)

We are not in the *Hasson* situation. First, the retrial has already occurred. Second, the record is clear that strict liability was eliminated as a basis of liability. To not honor the jury's verdict on those counts would mean the defendant would lose an advantage fairly won. Third, retrial in *Hasson* was necessitated by instructional error as opposed to a hung jury.

Nor are we in the situation presented in *Falls* v. *Superior Court* (1987) 194 Cal.App.3d 851 [239 Cal.Rptr. 862], a case where the partial special verdict failed to dispose of all elements of a single cause of action for negligence. There, the jury resolved the issue of the defendant's negligence but did not resolve the issue of liability in the plaintiff's favor since it did not reach the issue of the plaintiff's comparative negligence, if any, or the contributory negligence of the settling defendant. (*Id.* at p. 855.)

Further, contrary to appellant's suggestion, there has been no denial of the right to have a decision upon the facts from the jury that hears the evidence. Appellant refers us to the case of *European Beverage, Inc.* v. *Superior Court* (1996) 43 Cal.App.4th 1211, 1214 [51 Cal.Rptr.2d 147]. After conclusion of the first phase of a bifurcated court trial, the trial judge who determined the plaintiff's ownership interest in a corporation was reassigned to another department. The defendants unsuccessfully sought to prevent transfer of the case to a new judge. On their petition for writ of mandate, the reviewing court accorded them relief, holding that absent a waiver or stipulation, a party is entitled to have the same judge try all phases of a bifurcated trial that

depend on weighing evidence and determining credibility. If that judge is unavailable, a mistrial is in order. (*Id.* at p. 1213.) The court relied on the concept that where there has been an interlocutory judgment subject to modification prior to entry of final judgment, it is a denial of due process for a new judge to render final judgment without having heard all the evidence. (*Id.* at p. 1214.) To reiterate, although the trial court in this case said it was entering "interlocutory judgment," in substance it determined as a matter of law from the special verdicts on fraud and strict liability that those causes of action had been conclusively resolved and adjudicated in Baxter's favor, and reserved entry of judgment pending further consideration of the negligence count, all in accordance with sections 624 and 628. The decision on those causes of action was not subject to further modification and thus there was no denial of due process in having the remaining cause of action tried by another jury.

Appellant also contends that there is no legislative authority for declaring a partial mistrial. Section 616 provides that where the jury is discharged without having rendered a verdict, the action may be tried again immediately or at such time as the court directs. Of course section 616 does not say that partial retrials cannot be ordered. It makes no sense to narrowly construe this statute in a manner that is at odds with the trial court's ability to partially resolve matters before it and thus contain the issues for future determination. Not only is our decision today consistent with the statutory scheme on special verdicts and consistent with the legislative trend to craft procedural devices to enable partial resolution of issues when appropriate, it also advances the policy of this state to promote judicial economy. Where jury efforts on special verdicts can be preserved rather than lost and issues thus narrowed upon which evidence must be taken at trial and upon which a second jury must deliberate and decide, the burden on the parties and the courts is reduced.

**B.** *The Valentine II Court Properly Directed Judgment Against Appellant on Negligent Failure to Warn*

We next take up the matter of the directed judgment against appellant on negligent failure to warn. The precise issue is whether the negative finding on strict liability failure to warn in Valentine I subsumed the negligent failure to warn theory and thus exonerated Baxter of *any* liability for failure to warn.

In arguing for a limited scope of retrial that would omit negligent failure to warn, Baxter claimed just that, but the Valentine II court disagreed and

sent all five[11] negligence theories to the jury. Then, after the jury deadlocked on negligent failure to warn as well as whether any negligence in testing or inspection caused injury to Mrs. Valentine, the court granted the defense motion for directed judgment pursuant to section 630, subdivision (f).[12] We conclude the directed verdict on negligent failure to warn was correct because the strict liability verdict in Valentine I foreclosed a finding of negligent failure to warn.

The Valentine I jury was instructed as follows on strict liability/failure to warn: "A product is defective if the use of the product in a manner that is reasonably foreseeable by the defendant involves a substantial danger that would not be readily recognized by the ordinary user of the product and the manufacturer knows or should have known of the danger but fails to give adequate warning of such danger. [¶] A manufacturer has a duty to provide an adequate warning to the user on how to use the product if a reasonably foreseeable use of the product involves a substantial danger of which the manufacturer is either aware or should be aware, and that would not be recognized by the ordinary user. [¶] A manufacturer has a duty to provide an adequate warning to the consumer of a product of potential risks or side effects which may follow the foreseeable use of the product and which are known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge at the time of manufacture and distribution. [¶] In the case of silicone breast implants, such [a] warning must be given to the physician."

Later, after the jurors commenced deliberations, they asked the court, with regard to strict liability duty to warn, whether that duty includes "continuous duty as long as product in use? (it's defined that way for question #3 [negligence] but it's not defined in question #1 [strict liability])." The judge answered the question in writing and returned it to the jury: "The duty to warn physicians is a continu[ous] one."

The court instructed the Valentine I jury on negligent failure to warn, as follows: "One who supplies a product . . . which the supplier knows or has

---

[11]These were: design, testing, inspection, warning and manufacturing.

[12]This statute provides that when a jury has been discharged without rendering a verdict, the court "may order judgment to be entered in favor of a party whenever a motion for directed verdict for that party should have been granted had a previous motion been made."

A motion for directed verdict will be granted where there is no substantial conflict in the evidence, after giving full legal value to the evidence of the party against whom it has been directed. (*Dalrymple* v. *United Services Auto. Assn.* (1995) 40 Cal.App.4th 497, 523 [46 Cal.Rptr.2d 845].) Admittedly, this was an unusual application of section 630, subdivision (f). But since, as a matter of law, the Valentine I verdict disposed of the negligent failure to warn cause of action, there was *no evidence* in favor of plaintiffs for the Valentine II court to assess and thus judgment was properly entered on Baxter's motion.

reason to know is dangerous or is likely to be dangerous for the use for which it is supplied, has a duty to use reasonable care to give warning of the dangerous condition of the product or of facts which make it likely to be dangerous to those who the supplier would expect to use the product or to be endangered by its probable use, if the supplier has reason to believe that they will not realize its dangerous condition." "A manufacturer's duty to warn is a continuous duty which lasts as long as the product is in use."

Under the strict liability/duty to warn instructions, the verdict in the first trial disposed of *any* liability for failure to warn. First, contrary to appellant's assertion, the court expansively advised the jury that under *any* theory, the duty to warn physicians was a continuous duty as long as the product was in use. Appellant argues that the finding that Baxter was not liable for failure to warn was capped at 1975 (the date of Mrs. Valentine's implant) under the strict liability instructions tying the duty to warn of side effects to what was scientifically knowable *at the time of manufacture and distribution*. But again, the judge specifically told the jurors that the duty to warn physicians was *continuous*. This additional instruction thus modified the instruction about scientific knowledge at the time of manufacture and distribution. Therefore, under the modified instructions, as more information about adverse effects develops over time, the manufacturer must continue to provide physicians with warnings, at least so long as it is manufacturing and distributing the product.

Second, the strict liability definition of defective product, coupled with instructions on the strict liability duty to warn physicians of the potential risks or side effects of silicone breast implants that were "known or knowable," more than subsumed the elements of duty to warn set forth in the negligence instructions. The court defined a product as defective if its use involved a substantial danger that would not be readily recognized by the ordinary user and the manufacturer knows/should have known of the danger but fails to warn. Under the negligence warning instructions, the manufacturer was charged with knowing/having reason to know that the product is dangerous or likely to be dangerous for its intended use.

To begin with, we fail to see a real difference between a warning to ordinary users about a product *use* that involves a substantial danger, and a warning about a *product* that is dangerous or likely to be dangerous for its intended use. The former warning centers on the term "use." A product whose use *involves* a substantial danger may or may not harm any particular user. The latter warning centers on (1) the dangerous condition of the *product*, or (2) facts likely to make *the product* dangerous. Again, under the "likely" prong, the product may or may not harm any particular user. As a

practical matter then, the difference in the two concepts is so small as to make no difference.

Moreover, we disagree with appellant's assertion that the jury may have decided that the "ordinary user" referred to in the strict liability instructions did not include people highly susceptible to autoimmune disease. This argument makes no sense. In the case of prescription drugs and implants, the physician stands in the shoes of the "ordinary user" because it is through the physician that a patient learns of the properties and proper use of the drug or implant. Thus, the duty to warn in these cases runs to the physician, not the patient. (See *Carlin* v. *Superior* Court (1996) 13 Cal.4th 1104, 1116, 1118 [56 Cal.Rptr.2d 162, 920 P.2d 1347].) In any event, even if we were to construe "ordinary user" as the patient, we would not conclude that the instruction is drawing a distinction between ordinary people and highly susceptible people in terms of danger from product use. Rather, taken this way, the instruction is drawing a distinction between what an ordinary person would *recognize* as dangerous in the reasonably foreseeable use of the product, as opposed to what a moron or a person with special knowledge or training, would recognize.

Further, the finding of the Valentine I jury that the implants were not defective due to Baxter's failure to warn included the finding that Baxter discharged its duty to warn of potential risks or side effects which were "known or knowable . . . ." The manufacturer's duty, per strict liability instructions, to warn of *potential* risks and side effects envelopes a *broader* set of risk factors than the duty, per negligence instructions, to warn of facts which make the product "*likely to be* dangerous" for its intended use. A "potential" risk is one "existing in possibility" or "capable of development into actuality,"[13] while a product "likely" to be dangerous will "in all probability" or "probably" be dangerous.[14] Stated differently, if Baxter adequately warned of potential risks and side effects, it of necessity warned of facts likely to render the product dangerous to the user. But conversely, one could discharge the duty to warn of likely risks without discharging the duty to warn of potential risks. In sum, the manufacturer's strict liability duty to warn is greater than its duty under negligence, and thus negligence requires a greater showing by plaintiffs.

Moreover, the "known or knowable in light of" language in the strict liability instruction at a minimum encompasses the "knows or has reason to know" language in the negligence instruction. Under a negligence standard, a reasonable manufacturer would not be charged with knowing more than

---

[13]Webster's New Collegiate Dictionary (9th ed. 1984) page 921, column 1.
[14]Webster's New Collegiate Dictionary, *supra*, page 692, column 1.

what would come to light from the prevailing scientific and medical knowledge. ■ As explained in *Anderson* v. *Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 1002-1003 [281 Cal.Rptr. 528, 810 P.2d 549]: "Negligence law in a failure-to-warn case requires a plaintiff to prove that a manufacturer or distributor did not warn of a particular risk for reasons which fell below the acceptable standard of care, i.e., what a reasonably prudent manufacturer would have known and warned about. Strict liability is not concerned with the standard of due care or the reasonableness of a manufacturer's conduct. The rules of strict liability require a plaintiff to prove only that the defendant did not adequately warn of a particular risk that was known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of manufacture and distribution. Thus, in strict liability, as opposed to negligence, the reasonableness of the defendant's failure to warn is immaterial." (Fn. omitted.)

■ Finally, appellant's authority to the contrary is inapposite. First, *Hernandez* v. *Badger Construction Equipment Co.* (1994) 28 Cal.App.4th 1791, 1802, 1826-1828 [34 Cal.Rptr.2d 732]. Although the plaintiff in that case apparently proceeded against the defendant on a strict liability theory for design defect and failure to warn, the special verdict simply indicated there was no design defect. However, the jury did find for the plaintiff on the negligence count. Several negligence themes were argued, including failure to equip the crane with a special device, failure to give adequate warning and failure to conduct an adequate retrofit campaign. The reviewing court concluded that the no design defect finding did not preclude a negligence verdict because failure to conduct an adequate retrofit campaign could constitute negligence apart from the issue of design defect. Unlike *Hernandez*, here we have a jury finding of no strict liability for failure to warn, which finding cannot admit a companion finding for negligent failure to warn. Thus, *Hernandez* does not pertain. Next, to a similar effect is *Jiminez* v. *Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 382, 385 [93 Cal.Rptr. 769, 482 P.2d 681, 52 A.L.R.3d 92] (plaintiff entitled to negligence instructions; on what were in effect strict liability instructions for manufacturing defect, jury could have found that the ladder in question was not defective when sold because it was safe for use on hard ground, while simultaneously finding manufacturer should have warned against its use on soft ground).

C. *The Valentine II Court Also Properly Directed Judgment Against Appellant on Negligent Testing and Inspection*

■ The trial court instructed the jury in Valentine II along the lines of the language of BAJI No. 9.21 (8th ed. 1994) that a "manufacture[r] of a

product that is reasonably certain to be dangerous if negligently made has a duty to exercise reasonable care in the . . . testing and inspection of that product . . . so that the product may be safely used in a manner and for a purpose for which it was made." The comment to BAJI No. 9.21 indicates that the testing and inspection aspect of the instruction derives from two sources. First is *Reynolds* v. *Natural Gas Equipment, Inc.* (1960) 184 Cal.App.2d 724, 730 [7 Cal.Rptr. 879], where the issue was whether the evidence would support a finding of negligence due to defective design or failure to caution about the safety factors involved in operating the gas burner. In resolving the negligence question, the court held that the duty of care owed by a manufacturer to users of its product "requires reasonable care to be exercised in assembling component parts and inspecting and testing them before the product leaves the plant." (*Id.* at p. 736.)

Second is the Restatement Second of Torts section 396, having to do with the effect of a third party's duty to inspect. As explained in comment (b), the inspection duty is tied inextricably to a manufacturer's other duties: "The fact that the inspection, if made, would have disclosed the dangerous character of the chattel and enabled him who owed the duty to correct the defect or give a warning or instructions which would have made it possible to use it safely, subjects the one who fails to perform the duty to liability for physical harm resulting to those to whom the duty is owed." (Rest.2d Torts, § 396, com. b, pp. 332-333.) Thus, the duty of testing and inspecting has no significance apart from the results of the product's design and manufacture and the relevant warnings. And, in these activities, Baxter is charged constructively with the best scientific and medical knowledge, and with knowledge of substantial dangers involved in the implant's reasonably foreseeable use of which Baxter, as manufacturer, should be aware, but that the ordinary user would not recognize. Since Baxter has been exonerated of liability for manufacture, design and warning, nothing remains upon which to hang the testing and inspection duties.

This concept has been cogently framed by the district court in *Kociemba* v. *G.D. Searle & Co.* (D.Minn. 1989) 707 F.Supp. 1517. The jury returned a defense verdict for negligent design and manufacture, while rendering a plaintiff's verdict on negligent failure to warn and negligent testing and inspection. On defendant's motion for judgment notwithstanding the verdict as to negligent testing and inspection, the court had this to say: "The Court elevated the duty to test to an independent cause of action by including an interrogatory on the special verdict form asking whether [defendant's] negligent failure to test caused plaintiff's injuries. [¶] Presumably, the reason that manufacturers are under a duty to test their products is to discover defects or dangers associated with [the] use of the products. Once the

manufacturer has discovered a defect or [a] danger the manufacturer should either change the product's design or manufacturing process, or warn consumers of the danger associated with using the product. [¶] Thus, unless the manufacturer's breach of its duty to test leads the manufacturer to produce a product that is defective in design, manufacture, or warning, no injury can result. If the manufacturer designs the product safely, manufactures the product safely, and provides an adequate warning of dangers inherent in the use of the product, then a failure to test the product cannot, standing alone, cause any injury. The duty to test is a subpart of the other three duties because a breach of the duty to test cannot by itself cause any injury." (*Id.* at p. 1527.)

In calling for an independent duty to test, appellant posits that "appropriate testing for long term effects would have revealed different information from what was 'known or knowable' in the scientific community," that is, it "would have produced information that was not otherwise known or knowable in the scientific community at the time of manufacture and distribution, simply because the dangers only become 'knowable' *with time*." (Original italics and bold print.) Appellant forgets that Baxter was charged with an *ongoing* duty to warn of side effects "known or knowable" in the scientific community. In this light, imposition of liability for breach of an independent duty to conduct long-term testing, where the causal link to the known harm to plaintiff is the *unknown outcome of testing that was not done*, would be beyond the pale of any California tort doctrine we can identify.

D.   *The Special Verdict Form in Valentine II Will Stand*

■■■    Appellant also complains that the verdict in the second trial is fatally flawed because the special verdict form erroneously pinpointed *specific* acts of negligence, thereby ultimately enabling the trial court to direct judgment for the defense. Appellant relies on *Stoner* v. *Williams* (1996) 46 Cal.App.4th 986 [54 Cal.Rptr.2d 243]. We agree with the reasoning of *Stoner*, that at least nine of twelve civil jurors must concur that each element of a cause of action has been proved by a preponderance of the evidence, but, faced with multiple or alternative acts which could support an element of a cause of action, nine jurors need not concur on which act is proved. (*Id.* at p. 1002.) However, we do not agree that *Stoner* renders the instant verdict fatally flawed.

As explained in *Stoner*, the issue boils down to whether there is one, or multiple, causes of action and whether one, or multiple, "primary rights" of plaintiff have been violated. (*Stoner* v. *Williams*, *supra*, 46 Cal.App.4th at p. 1003.) ■■■   According to the "primary rights" theory, the breach of plaintiff's primary right and the corresponding duty devolving upon defendant

gives rise to a single cause of action. " '[T]he primary right and duty and the delict or wrong combined constitute the cause of action . . . .' " (*McKee* v. *Dodd* (1908) 152 Cal. 637, 641 [93 P. 854], quoting Pomeroy on Remedies and Remedial Rights, § 452 et seq.; see also 4 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 24, pp. 85-86.) Thus, the cause of action is based on the harm suffered, not the particular theory which the litigant asserts. (*Bay Cities Paving & Grading, Inc.* v. *Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 860 [21 Cal.Rptr.2d 691, 855 P.2d 1263].)

■ Here, there was a single cause of action against the manufacturer for negligence in making the product. The court delivered the following instruction patterned after BAJI No. 9.21 (8th ed. 1994): "The manufacture[r] of a product that is reasonably certain to be dangerous if negligently made has a duty to exercise reasonable care in the design, manufacture, testing and inspection of that product . . . ." Mrs. Valentine sought damages for the purported violation of a single right, the right to be supplied with an implant that was not negligently made.[15]

Thus, under *Stoner*, nine jurors need not have agreed on the alternative theories of design, manufacture, inspection or testing. But submission of the special verdict form did not harm appellant because, even if one added up the votes on all theories, including failure to warn, nine jurors did not concur on *all* elements of the cause of action. While nine jurors found negligent testing and inspection, only eight found causation and in any event that verdict was legally superfluous, as discussed above.

Appellant complains nonetheless that the special verdict form in Valentine II impermissibly called for evidentiary facts as opposed to ultimate facts. But the special verdicts did not call for evidentiary facts—where, for example, are the evidentiary facts in question No. 1: "Were the Defendants negligent in failing to exercise reasonable care in the design of Plaintiff's breast implants?" There are none. True, these questions parse the negligence cause of action more finely than had the jurors simply been asked: "Were the Defendants negligent?" But, given that there were two trials and two sets of

---

[15]Arguably, negligent failure to warn involves a separate primary right and duty, and hence constitutes a separate cause of action. The primary right in warning cases is the right to adequate warnings about the dangerous condition of the product or facts likely to make the product dangerous. The duty on the part of the manufacturer and supplier is, of course, to provide adequate warnings and indeed BAJI No. 9.20 is a stand-alone instruction on negligence—duty to warn. This right and duty contrasts with the right to be supplied with a product that is not negligently made, with the corresponding duty of due care in the design, manufacture, testing and inspection of the product.

In any event, as we have determined, plaintiff was not entitled to pursue the negligent failure to warn theory in Valentine II.

verdicts, with some issues having been decided in the first trial, selection of a more detailed special verdict form was well within the trial court's discretion. A special verdict asking the generic question whether the defendant was negligent would have resulted in no verdict at all and an unnecessary third trial on legal theories that were unavailable to appellant. This was a case calling for special verdicts that would pinpoint the jury's fact finding and enable judgment to be entered rather than prolonging litigation with a possible third trial.

E.-H.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

We affirm the judgment.

Hanlon, P. J., and McGuiness, J.,* concurred.

A petition for a rehearing was denied February 3, 1999, and appellant's petition for review by the Supreme Court was denied April 14, 1999.

---

*See footnote, *ante*, page 1467.
*Presiding Justice of the Court of Appeal, First District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.