Filed 10/29/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| WAYNE GALL, | B296394 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC504268) |
| v. | |
| SMITH & NEPHEW, INC., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Randolph Rogers, Judge.  Affirmed.

Brice E. Bryan & Associates, Brice E. Bryan and Christopher J. Brantingham for Plaintiff and Appellant.

Shaw Koepke & Satter, John W. Shaw, Jens B. Koepke; Irwin Fritchie Urquhart & Moore and David W. O'Quinn for Defendant and Respondent.

_____

When a hip joint deteriorates, a hip resurfacing implant is one possible treatment. Smith & Nephew, Inc. (or simply "Smith") manufactures hip resurfacing implants. Smith's product in this case had two parts: a metal ball that covers the top of the femur, and a cup that fits inside the hip socket. When a surgeon puts these ball-and-cup surfaces in the joint, the polished metal surfaces are supposed to allow smoother movement than the damaged bone or cartilage they replace.

The patient and plaintiff in this case is Wayne Gall, who had this kind of hip resurfacing surgery for his left hip. Gall recovered and became physically active. But years later, convinced his implant was unsatisfactory, Gall sued Smith.

Gall's first theory was "failure to warn": Smith failed properly to warn Gall's surgeon, Dr. Jaime Hernandez, about the risks of using Smith's product. The trial court granted summary judgment for Smith because Hernandez independently knew these risks. Hernandez stayed current by reading scientific publications. Whether Smith gave Hernandez redundant warnings did not matter, the court ruled, when Hernandez already had the necessary information.

Gall's second theory was that Smith's product was defective. The trial court granted summary judgment because Gall did not show anything was wrong with his implant. Gall did show Smith's quality control procedures once failed to satisfy regulatory authorities, but the trial court concluded this fact did not imply the parts Gall received were defective.

The trial court also allowed a declarant to revise his declaration, which Gall protests.

The trial court's rulings were proper. We affirm.

2

## I

Gall sought medical help for hip pain. On November 24, 2010, Hernandez described Gall's treatment options. Hernandez recommended hip resurfacing surgery. In this procedure, the surgeon trims the femoral head, caps it with a metal covering, and puts a cup in the pelvic socket. Both implants are metal. These are the implants Smith makes.

Hernandez had special training for this kind of surgery. He traveled to England to study with the surgeon who designed this implant. Hernandez has performed hundreds or thousands of these surgeries.

Hernandez routinely stayed abreast of developments in his field. He learned about this procedure's risks from scientific studies. Hernandez's source was "science that has been established and researched. And I have equal access to that information that the people making the labels do. [¶] So before I look at labels, I have the information that I need. I have the access to the information that I need. To the science that I need to educate the patient prior to opening any box [containing Smith's product] and looking at any [manufacturer's] label."

By reading the scientific studies, Hernandez learned about the possible risks and side effects "years" before operating on Gall.

On November 24, 2010, Hernandez advised Gall about his surgical options and risks. Hernandez and Gall had different recollections of what Hernandez told Gall that day. They disagreed about whether Hernandez told Gall the metal implants could release metal particles that could cause a soft tissue mass to form. This tissue mass is sometimes called a pseudotumor.

3

Gall claimed Hernandez told him *no* known medical consequences could arise from the metal ions.

Hernandez had a different account. He testified he did not recall the particulars of his conversation with Gall. Hernandez had a custom, however, of discussing major complications with all surgery patients before he operated on them. Hernandez had a lengthy list of complications he customarily discussed: metal ion pseudotumor, tissue damage, soft tissue injury, pain, infection, bleeding, blood clots, bone fracture, leg length discrepancy, dislocation, loosening, component fracture and wear, implant failure, loss of limb, amputation, renal complications, nervous system complications, mental status changes, and systemic and local complications.

Hernandez testified about what he knew of the risks on the date he counseled Gall: November 24, 2010. Hernandez knew the body's reaction to metal-on-metal wear debris could produce an adverse local tissue reaction. He knew this surgery could cause soft tissue masses called pseudotumors.

After the November 24, 2010 consultation, Gall decided to go ahead with the procedure. Hernandez performed the surgery on March 28, 2011.

About a month after the operation, Gall reported good progress. By September 2011, Gall was walking with a normal gait and was playing baseball. "He has only very occasional anterior muscle ache with prolonged activity. No fever, chills or systemic complaints. He is performing all his activities." This type of muscle ache, Hernandez testified, is not uncommon after this type of hip surgery.

After the surgery, Gall began playing full court basketball in a league.

Gall eventually became concerned about blood tests showing somewhat elevated levels of cobalt and chromium. On February 16, 2014, Hernandez told Gall those test levels were "not concerning for implant failure." Hernandez did not recommend further testing. That was Gall's last contact with Hernandez.

After that visit with Hernandez, Gall did not consult with other doctors about metal ion levels in his blood.

Gall sued Smith and Hernandez. In his deposition, Gall testified his main concern was the ion level in his blood. After he filed suit, Gall got a scan showing that he possibly had developed a pseudotumor. There is no evidence this tissue mass is anything but benign. No evidence shows the mass was growing or having adverse or noticeable effects on Gall's health.

Smith moved for summary judgment, which Gall opposed. The court issued an eight-page tentative ruling, heard the motion, and granted it on February 7, 2019. Gall appealed.

## II

We independently review the summary judgment ruling under the usual standard. (See *Loomis v. Amazon.com LLC* (2021) 63 Cal.App.5th 466, 475.) There are three issues on appeal: whether Smith's failure to warn Hernandez harmed Gall; whether Smith's product was defective; and whether the trial court could permit a witness to revise a declaration.

## A

The first issue is whether there was a failure to warn.

Tort law has a special twist when it comes to manufacturers, physicians, and patients. In the case of prescription drugs and implants, the physician stands in the shoes of the product's ordinary user: a patient learns of the

5

properties and proper use of the drug or implant from the physician.  In these cases, the manufacturer's duty to warn runs to the physician and not to the patient.  (*Valentine v. Baxter Healthcare Corp.* (1999) 68 Cal.App.4th 1467, 1483.)

This special twist is called the "learned intermediary" doctrine.  (*Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 318–320.)  Its motivating force is that, for prescription drugs and implants, the doctor interrupts the ordinary commercial chain from the manufacturer to the final consumer.  Patients want to be able to rely entirely on their doctors' informed and independent judgments.  The law and medical ethics both demand that doctors, for their patients' benefit, evaluate scientific information about prescription drugs and implants.  Manufacturers thus must warn *doctors* about product risks.  This duty does not extend to *patients*, with whom manufacturers have no cost-effective channel of communication and for whom the data would be duplicative even if the patient could interpret it.  (*Id.* at p. 319.)

For Gall's suit against Smith, then, the decisive issue is, when Hernandez counseled Gall on November 24, 2010, what medical risks Hernandez *knew*.  What Hernandez *told* Gall is a different matter.  That might be pertinent to Gall's lawsuit against Hernandez, but that case is not before us.

If Hernandez were fully informed about the implant's risks on November 24, Smith wins on this claim, for any failure by Smith to inform Hernandez could not have caused Gall any harm: Hernandez already had the needed warning.  The parties agree on this point.

The trial court rightly ruled that Hernandez's deposition was unambiguous.  Hernandez knew about the metal ion issue

because he read the underlying scientific studies as they appeared. Hernandez used primary materials to keep himself current in his specialty and did not need or use manufacturers' republications and warnings.

Gall resists this conclusion by seizing on one sentence in Hernandez's deposition. Gall claims this sentence creates a material dispute over whether Hernandez knew about the metal ion risk from Smith's product. The trial court properly rejected this argument. Hernandez was clear and consistent throughout his deposition: he knew about this risk. No other interpretation of this deposition is reasonable.

The context is as follows.

> *Q [by Gall's counsel]: So since you met with him before this warning came out, if it had come out sooner, would you have told him "Hey, there was an FDA warning that came out and this is the information that was in it." Something to that effect?*
>
> *Mr. Stockalper [Hernandez's counsel]: Again, you're characterizing this as a warning. It's—and it's been asked and answered. He's already testified that he's aware of this information. He talks to the patient about the information. It's part of the risk complications. So it's asked and answered. So I don't—*
>
> *A [by Hernandez]: Yes. I would have—I would have—I talk to patients about all—all the information that is relevant to their specific situation and the science that's available.*

Gall's argument is that the Food and Drug Administration published information about metal ion risks between the time of Hernandez's November 24, 2010 consultation and the March 28,

7

2011 surgery, and in the just-quoted answer Hernandez demonstrated in effect he did *not* know of the metal ion risk on November 24, 2010.

Gall's proposed interpretation is not reasonable. Hernandez testified he *did* know of the ion risk on November 24, 2010. Hernandez's testimony was straightforward: steadfast, unequivocal, and with no backtracking.

When evaluating the record of a summary judgment motion, the trial court must consider all inferences reasonably deducible from the evidence in the opposing party's favor. (Code Civ. Proc., § 437c, subd. (c); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843, 850–851.) The court may not weigh the plaintiff's evidence or inferences against the defendants' as though it were sitting as the trier of fact. The court nevertheless must determine what the evidence or inference could imply to a *reasonable* trier of fact. (*Aguilar*, at p. 856.)

The fact that Hernandez knew of the ion risk when counseling Gall deflates many of Gall's other arguments. These arguments involve an agency alert in the United Kingdom, Smith's delay in getting data to the Food and Drug Administration, and an allegedly deficient brochure. The pertinence of these arguments evaporates once Hernandez explained he learned of the ion risk from scientific studies. The agency alerts and the brochure merely repeated what Hernandez already knew. The secondhand reports were superfluous.

Hernandez testified that nothing about the Food and Drug Administration's warning changed his "thinking or decision making for Mr. Gall." He said, "this information was already known by me." The contents of this agency alert was "no news to anybody like me." Gall does not suggest or offer authority for the

notion that an agency imprimatur changes the quality or significance of the science the agency relayed.

The trial court properly rejected Gall's argument on the failure-to-warn issue.

B

The second issue is whether there was a manufacturing defect in the product Smith supplied to Gall.

A defective product differs either from what the manufacturer intended or from the standard items in the manufacturer's same product line. (*Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413, 429.) A classic manufacturing defect is when a product leaves the assembly line in substandard condition, as when a crane maker means to use strong cable but mistakenly installs weak cable in its crane. (*Ibid.*, citing *Lewis v. American Hoist & Derrick Co.* (1971) 20 Cal.App.3d 570, 580.)

Gall did not show his implant came from the factory in substandard condition. The evidence was to the contrary. His implant had been checked for defects twice: once at the factory and again by Hernandez before he used it in Gall's operation. Both inspections showed Gall's implant was free of defects.

Gall points to a 2010 inspection report by the Food and Drug Administration that criticized Smith for lacking validation of supplier processes. The trial court accurately characterized this report as showing merely that Smith's quality control *process* did not satisfy the regulatory authorities. No evidence shows any defective product entered the stream of commerce.

Gall cites no product defect precedent for substituting a *process* defect for a *product* defect. Gall's opening brief cites only two decisions in this argument. Both decisions concern employment law, not defective products. (See *McDonald v.*

9

*Antelope Valley Community College Dist.* (2008) 45 Cal.4th 88; *Reeves v. Safeway Stores, Inc.* (2004) 121 Cal.App.4th 95.) Nor does Gall attempt an analysis of the strengths and weaknesses of his proposed doctrinal innovation. We will not embark on this journey without some kind of map.

To the extent Gall attempts to argue the alleged pseudotumor itself is evidence of a defect, the trial court correctly noted this fact does not support Gall's belief his implant was defective. Pseudotumors are risks of nondefective implants. This result is consistent with a perfect implant and is not probative of a defect.

C

Gall's negligence claim falls with his claims about the failure to warn and the manufacturing defect. These claims share the same causation element. Gall concedes this point. We affirm the trial court's rulings on the failure-to-warn and manufacturing defect claims. We thus likewise affirm the trial court's ruling on Gall's negligence claim.

D

Gall argues in his opening brief that the trial court erred by considering evidence attached to the declaration of attorney David O'Quinn in support of Smith's motion. Gall bases this argument on O'Quinn's technical violation of Code of Civil Procedure section 2015.5: O'Quinn executed the declaration outside California but did not include language stating he made the declaration under penalty of perjury "under the laws of the State of California." O'Quinn fixed this mistake before the hearing. Gall's argument is meritless. (See *Hearn v. Howard* (2009) 177 Cal.App.4th 1193, 1203–1204 [courts can properly find errors under section 2015.5 harmless].)

## DISPOSITION

We affirm the judgment and award costs to Smith & Nephew.


WILEY, J.

We concur:


STRATTON, Acting P. J.


OHTA, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.