[No. A121577. First Dist., Div. One. Sept. 9, 2009.]

JUDY OXFORD et al., Plaintiffs and Respondents, v.
FOSTER WHEELER LLC, Defendant and Appellant.

## COUNSEL

Sedgwick, Detert, Moran & Arnold, Frederick D. Baker and Brian R. Thompson for Defendant and Appellant.

Brayton Purcell, Alan R. Brayton, Gilbert L. Purcell, Lloyd F. LeRoy and Richard M. Grant for Plaintiffs and Respondents.

## OPINION

GRAHAM, J.*—Defendant, Foster Wheeler LLC, appeals from the judgment entered against it after a jury trial. Defendant contends the trial court erred in refusing to enter judgment in its favor based on the jury's positive finding on the federal "government contractor defense." Defendant also claims the court erred in refusing to instruct on the "sophisticated user" doctrine, and that the jury's finding of negligence is irreconcilably inconsistent with its findings that defendant's product was not defective. Because the jury rendered inconsistent verdicts, we will reverse and remand for a new trial.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### I.  The Complaint

On March 22, 2006, plaintiff Judy Oxford, individually and as successor in interest to Calvin Oxford (Oxford), and Chris Oxford and Jennifer Odegaard as legal heirs of Oxford (collectively referred to as plaintiffs), filed their first amended complaint against defendant Foster Wheeler and several other defendants. The complaint alleged that Oxford was exposed to asbestos between 1963 and 1967 while assigned to the boiler repair shop of the U.S.S. Klondike—a United States Navy vessel that functioned as a repair ship for other Navy warships—and while working at various shipyards including the Long Beach Naval Shipyard in Long Beach, California. In 2005, Oxford was diagnosed with mesothelioma, a cancer of the lining of the lung. He died that same year. The complaint states causes of action against defendant for negligence, products liability, and false representation, and prays for damages including loss of consortium, and wrongful death.[1]

On May 17, 2006, defendant filed its answer to the first amended complaint. As an affirmative defense, defendant alleged that its asbestos-containing products had been manufactured in accordance with contract specifications imposed by the United States government.

---

*Retired judge of the Marin Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

[1] The claim for false representation was dismissed prior to the filing of defendant's answer.

II. *Evidence Presented at Trial*

During World War II, defendant manufactured D-style boilers that were installed in ships belonging to the United States Navy. The boilers included asbestos materials within the insulation, handholes, manholes, and flanges that connect valves and steam outlets to the boiler, as well as in the part of the boiler system known as the economizer. The steel enclosure for the boiler included one-inch asbestos-containing high-temperature insulating block inside the furnace walls, tube banks, and roof.

The Navy provided defendant with performance and mechanical specifications that were used to design the boilers, including specifications with respect to steam quantity, steam pressure, and steam temperatures. Defendant incorporated those specifications into a design intended to meet these specific performance requirements. The Navy specifications required that asbestos be used in certain parts of the boilers. Many of these World War II ships were overhauled during the 1960's for use during the Vietnam War.

The evidence presented showed that by 1930 medicine and science had established that asbestosis, an incurable scarring disease of the lung, was associated with exposures to asbestos in the workplace. In 1946, the American Conference of Governmental Industrial Hygienists (ACGIH) first published its recommended threshold limit value for asbestos. The limit was set at 5,000,000 particles per cubic foot. This limit was considered protective against asbestosis. It was not intended to be a guideline protective against cancer. By 1960, there were suggestions of a link between asbestos exposure in the workplace, including exposure in the insulation industry, and cancer. A study published in 1972 demonstrated an association between amosite asbestos exposure and lung cancers, including mesothelioma. The ACGIH did not modify its recommended threshold value until 1974.

The Navy was aware of the health hazards associated with asbestos as far back as the 1930's. During the 1940's, steps were taken to minimize worker exposure to asbestos and other particulates during the construction of naval vessels. In 1946, researchers concluded that pipe insulation workers were not being exposed to dangerous levels of asbestos in naval shipyards.

The Navy first became aware of an incidence of mesothelioma in 1967. An industrial hygiene expert witness called by plaintiffs testified that the first time he saw warnings on a Navy ship regarding asbestos-containing thermal pipe insulation was in the early 1980's. A witness who had worked with Navy boilers during the 1960's testified that he never saw any warnings from a boiler manufacturer concerning the dangers of asbestos exposure. There was also testimony that in the 1960's defendant would not have known any more

than the Navy did regarding the health risks posed by the use of asbestos-containing products. Workers without respiratory protection who were repairing and maintaining defendant's boilers on Navy vessels in the 1960's would have been exposed to hazardous levels of asbestos.

Instruction manuals prepared by defendant at the time the boilers were originally manufactured do not contain any warnings regarding asbestos exposure, though they do warn of other potential hazards. The manuals address how to operate, test, repair, and maintain the boilers. All such manuals were submitted to the Navy for approval and acceptance. Once they were submitted and approved, the manuals became Navy publications. An expert witness on naval industrial hygiene testifying on behalf of defendant testified that the Navy did not intend for information on hazards other than those involved in the actual operation of the equipment to be included in instruction manuals. He also testified that the Navy has very specific requirements for Navy machinery instruction manuals.

While the boiler on the U.S.S. Klondike was not manufactured by defendant, Oxford's job included repairing and maintaining other warships' boilers, requiring him to remove, install, disturb, and handle asbestos-containing products. Some of those boilers were manufactured by defendant. The workers did not see any warnings associated with defendant's boilers regarding the dangers of working with asbestos-containing products, or advising that they should wear respiratory protection.

## III. The Verdict

On January 4, 2008, the jury, using a special verdict form, found against plaintiffs on their products liability claims for design defect and failure to warn, but found in favor of plaintiffs on their claim for negligence. The verdict form did not ask the jury to specify the factual basis for its negligence finding. The jury also found that defendant had proved the three elements of the government contractor defense: (1) That the United States government approved reasonably precise specifications for use by defendant in manufacturing the boilers, (2) that the boilers conformed to the approved specifications, and (3) that defendant warned the government about the dangers of its product that were known to defendant but not to the government.[2] The jury proceeded to award damages and to apportion liability among the various

---

[2] The jury was given the following special instruction: "A manufacturer may not be held liable for defects in military equipment when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States. Foster Wheeler bears the burden of establishing each of these elements."

responsible parties. The verdict form did not direct the jury to stop filling out the form once it made a positive finding on the affirmative defense.

After the verdict was rendered, defendant requested that judgment be entered in its favor, arguing the positive finding on the elements of the government contractor defense immunized it from liability. Plaintiffs contended below that judgment should be entered in their favor, in spite of the findings on the defense, because defendant had not demonstrated that "the products in this case are, quote, military equipment, close quote." The trial court found the affirmative defense did not foreclose judgment against defendant, reasoning that the defense verdict on the products liability claim for failure to warn did not subsume the jury's finding on negligent failure to warn, and that the government contractor defense does not apply to failure to warn claims. This appeal followed.

## DISCUSSION

### I.  *Standard of Review*

Plaintiffs assert that we must review the trial court's decision to enter judgment in their favor under the abuse of discretion standard. Plaintiffs are mistaken.

A fact finder may not make inconsistent factual determinations based on the same evidence. (*City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 682 [24 Cal.Rptr.3d 338] (*Horton*).) The standard of review for a special verdict is de novo. (*Id.* at p. 678.) Moreover, unlike the review of a general verdict, when a special verdict is considered, we do not infer findings in favor of the prevailing party. By its nature, a special verdict has "recognized pitfalls" because it requires the jury to resolve all controverted issues in a case, unlike a general verdict which implies findings on all issues in a party's favor.

Additionally, where the material facts are undisputed, the legal significance of those facts is a question of law, and an appellate court may draw its own conclusions independent of the trial court's ruling. (*Burden v. Snowden* (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672].) Each party requested that judgment be entered in its favor after the jury's verdict, and the trial court's ruling was based on its interpretation of the applicable law in light of the jury's findings. Accordingly, we review the judgment under a de novo standard of review. (See *Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68 [104 Cal.Rptr.2d 602, 18 P.3d 29].)

We review the trial court's refusal to give an instruction to the jury applying a prejudicial error standard. (*Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1069 [232 Cal.Rptr. 528, 728 P.2d 1163].)

## II. *The Government Contractor Defense*

### A. Boyle v. United Technologies Corp. *(1988) 487 U.S. 500 [101 L.Ed.2d 442, 108 S.Ct. 2510]*

The seminal case on the government contractor defense is *Boyle v. United Technologies Corp.* (1988) 487 U.S. 500 [101 L.Ed.2d 442, 108 S.Ct. 2510] (*Boyle*). David Boyle was a United States Marine helicopter copilot who drowned after crashing into the ocean. Though he survived the crash, he was unable to open the escape hatch because it had been built to open out instead of in, and water pressure prevented him from opening the door. One of the theories of liability asserted at trial was that the helicopter had been defectively designed. (*Id.* at pp. 502–503.) Judgment was entered in favor of decedent's father after a jury found the manufacturer negligent. The Fourth Circuit Court of Appeals reversed, concluding the manufacturer had proved the elements of the " 'military contractor defense.' " (*Id.* at p. 503.)

■ The Supreme Court noted that in areas of " 'uniquely federal interests' " state law may be preempted or displaced by federal law, and that civil liability arising from the performance of federal procurement contracts is such an area. (*Boyle, supra*, 487 U.S. 500, 504.) The court further determined that preemption or displacement of state law occurs in an area of uniquely federal interests only where a " 'significant conflict' " exists between an identifiable federal policy or interest and the operation of state law. (*Id.* at p. 507.) The court concluded that "state law which holds Government contractors liable for design defects in military equipment does in some circumstances present a 'significant conflict' with federal policy and must be displaced." (*Id.* at p. 512.)

■ In accordance with these principles, the court in *Boyle* announced a three-prong test for determining the circumstances in which state tort law is displaced by federal common law in lawsuits brought against military contractors: "Liability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." (*Boyle, supra*, 487 U.S. 500, 512.)

The court noted that not all products supplied to the military will qualify for immunity: "If . . . the United States contracts for the purchase and installation of an air-conditioning unit, specifying the cooling capacity but not the precise manner of construction, a state law imposing upon the manufacturer . . . a duty of care to include a certain safety feature would not be a duty

identical to anything promised the Government, but neither would it be contrary. The contractor could comply with both its contractual obligations and the state-prescribed duty of care. No one suggests that state law would generally be pre-empted in this context." (*Boyle, supra,* 487 U.S. 500, 509.)

Defendant contends the government contractor defense immunizes it from all tort liability and that the trial court should have entered judgment in its favor. Plaintiffs assert defendant's boilers do not qualify as "military equipment" under *Boyle,* and that therefore the government contractor defense has no application to the present case. In our view, both parties are incorrect.

B. *"Military equipment"*

On appeal, plaintiffs renew the argument they made in the trial court that defendant's boilers do not qualify as "military equipment" under *Boyle,* and therefore the government contractor defense does not apply. They do not claim that Navy vessels, and by extension their boilers, are not used for military purposes. Instead, they claim the defense does not apply because boilers similar to the ones used by the Navy were also sold by defendant to commercial users.

As they did in the trial court, plaintiffs rely on *In re Hawaii Federal Asbestos Cases* (9th Cir. 1992) 960 F.2d 806 (*Hawaii*). In *Hawaii,* a group of asbestos manufacturers had appealed the district court's decision to strike the military contractor defense. (*Id.* at p. 809.) The product at issue was asbestos insulation. After discussing *Boyle,* the appellate court reasoned that the concerns the Supreme Court had sought to address "do not exist in respect to products readily available on the commercial market." (*Hawaii, supra,* at p. 811.) The *Hawaii* court determined that such products "have not been developed on the basis of involved judgments made by the military but in response to the broader needs and desires of end-users in the private sector." (*Ibid.*) The court affirmed the district court's decision not to instruct the jury on the defense, concluding, as a matter of law, that the defendants could not satisfy the three elements of the *Boyle* test. (*Hawaii, supra,* at p. 813.)

We believe the present case is distinguishable from *Hawaii.* First, the products at issue in *Hawaii* were "bats" of asbestos insulation (*Hawaii, supra,* 960 F.2d 806, 813) that had not been "manufactured with the special needs of the military in mind" (*id.* at p. 812). In fact, the evidence showed the insulation was sold primarily to civilian petroleum companies. (*Ibid.*) As the Supreme Court stated in *Boyle,* the government contractor defense is intended to "assure that the design feature in question was considered by a Government officer, and not merely by the contractor itself." (*Boyle, supra,* 487 U.S. 500, 512.) There was no evidence in *Hawaii* that the military had provided

any design specifications to the asbestos manufacturers. The asbestos insulation was thus analogous to the air-conditioner described in *Boyle*, a product to which the defense would not apply. In the present case, in contrast, the boilers made by defendant were designed pursuant to exceedingly detailed and precise military specifications that required the use of asbestos in many instances.

■ We further observe California courts have determined that commercial availability of a product is not dispositive with respect to the government contractor defense. In *Jackson v. Deft, Inc.* (1990) 223 Cal.App.3d 1305 [273 Cal.Rptr. 214] (*Jackson*), a case involving paint products, the appellate court stated "in this case, the evidence that the polyurethane produced by [the defendant] was also sold commercially does not absolutely foreclose application of the military contractor defense." (*Id.* at p. 1319.) The court reasoned as follows: "In our view, if a product is produced according to military specifications and used by the military because of particular qualities which serve a military purpose, and is incidentally sold commercially as well, that product may nonetheless still qualify as military equipment under the military contractor defense." (*Ibid.*)

While courts such as the court in *Hawaii* have sought to confine the government contractor defense to products that are made exclusively for the military, we agree with the court in *Jackson* that this limitation is unduly confining. Though the court in *Boyle* discussed the parameters of the contractor defense in terms of "military equipment," use of that term appears to have followed from the facts of that case. Other courts considering this issue have concluded the defense is not limited to military contracts. A California court has observed that "*Boyle* does not distinguish between military and nonmilitary parties. Rather . . . , its application focuses instead on whether the issue or area is one involving 'uniquely federal interests' and, if so, whether the application of state law presents a 'significant conflict' with federal policy." (*Vermeulen v. Superior Court* (1988) 204 Cal.App.3d 1192, 1201 [251 Cal.Rptr. 805].) We also observe that courts in other jurisdictions have refused to distinguish military equipment from nonmilitary equipment in this context. (See, e.g., cases cited in *Carley v. Wheeled Coach* (3d Cir. 1993) 991 F.2d 1117, 1119, fn. 1.)

Finally, in the present case, the three *Boyle* elements were established by the jury's positive findings made on the special verdict form, including the finding that the boilers were designed pursuant to precise specifications approved by the United States government. In contrast, the *Hawaii* court found as a matter of law that this element could not have been proved by the defendants, due to the generic nature of the asbestos insulation that was involved in that case. (*Hawaii, supra,* 960 F.2d 806, 812.) Further, our review

of the record convinces us that each of the jury's three findings is supported by substantial evidence. In sum, we see no reason why defendant would be precluded from asserting the government contractor defense on the facts of this case.

C. *Application to negligence and failure to warn*

█ Plaintiffs contend that the government contractor defense does not apply to "negligent failure to warn" claims in cases in which the government neither provides warnings nor prohibits the manufacturer or supplier from providing them. We first observe that the Supreme Court in *Boyle* did not expressly limit its holding to products liability causes of action. Thus, the government contractor defense is applicable to related negligence claims. Other courts are in accord: "We agree with the Eleventh Circuit that whether the defense will apply cannot be determined by the label attached to the claim. Strict adherence to the three *Boyle* conditions specifically tailored for the purpose will ensure that the defense is limited to appropriate claims. In evaluating an assertion of the defense, therefore, the state law label on the claim(s) sought to be dismissed is irrelevant." (*Bailey v. McDonnell Douglas Corp.* (5th Cir. 1993) 989 F.2d 794, 801.)

While the defense thus has broad application, it does not immunize a defendant from all liability. As noted above, under *Boyle*, a contractor who supplies equipment to the government may be relieved of its duty under state tort law, but only when there is a "significant conflict" between the contractor's duty under state law and its duty under the government contract to comply with government specifications. (*Boyle, supra,* 487 U.S. 500, 509–512.) At least one California appellate court has indicated that the defense has limited application in failure-to-warn products liability cases, coming into play only if the applicable federal contract includes warning requirements that significantly conflict with those that would be imposed under state law. (*Jackson, supra,* 223 Cal.App.3d 1305, 1316–1317.)

Several federal courts are in accord: "We agree that the defendants' success in establishing the government contractor defense against the design defect claim does not by itself establish a defense to the plaintiffs' failure to warn claim. . . . Warning the government of dangers arising from a specific design—the third condition of *Boyle*—does not encompass or state a failure to warn claim; it simply encourages contractors to provide the government with all the information required to soundly exercise its discretion. 'By contrast, tort law duties to warn accomplish an entirely different objective of helping those who use or otherwise come into contact with a product to protect their own safety.' [Citation.] In the government contractor defense context, design defect and failure to warn claims differ practically as well as

theoretically. Simply because the government exercises discretion in approving a design does not mean that the government considered the appropriate warnings, if any, that should accompany the product. This is especially true with regard to military equipment procurement where complex judgments by representatives of the Armed Forces often involve 'balancing of many technical, military, and even social considerations.' [Citation.] We hold that the government contractor defense is not necessarily established merely by satisfying the government contractor defense conditions as to design defect claims." (*Tate v. Boeing Helicopters* (6th Cir. 1995) 55 F.3d 1150, 1156–1157 (*Tate*).)

The appellate court in *Tate* offered an alternative test for applying the government contractor defense in the context of failure to warn claims: "When state law would otherwise impose liability for a failure to warn of dangers in using military equipment, that law is displaced if the contractor can show: (1) the United States exercised its discretion and approved the warnings, if any; (2) the contractor provided warnings that conformed to the approved warnings; and (3) the contractor warned the United States of the dangers in the equipment's use about which the contractor knew, but the United States did not." (*Tate, supra*, 55 F.3d 1150, 1157.)

The *Tate* opinion explains the basis for the test as follows: "As in design defect cases, in order to satisfy the first condition—government 'approval'—in failure to warn cases, the government's involvement must transcend rubber stamping. And where the government goes beyond approval and actually determines for itself the warnings to be provided, the contractor has surely satisfied the first condition because the government exercised its discretion. The second condition in failure to warn cases, as in design defect cases, assures that the defense protects the government's, not the contractor's, exercise of discretion. Finally, the third condition encourages frank communication to the government of the equipment's dangers and increases the likelihood that the government will make a well-informed judgment." (*Tate, supra*, 55 F.3d 1150, 1157.)[3]

In the present case, the jury was not given a government contractor defense instruction tailored to the failure to warn context. While we note that the

---

[3] Other courts have agreed with the *Tate* opinion: "It is also well established, however, that a defendant may not defeat a state failure-to-warn claim simply by establishing the elements of the government contractor defense with respect to a plaintiff's design defect claim." (*Oliver v. Oshkosh Truck Corp.* (7th Cir. 1996) 96 F.3d 992, 1003; see also *Butler v. Ingalls Shipbuilding, Inc.* (9th Cir. 1996) 89 F.3d 582, 586 [" 'In a failure-to-warn action, where no conflict exists between requirements imposed under a federal contract and a state law duty to warn, regardless of any conflict which may exist between the contract and state law design requirements, *Boyle* commands that we defer to the operation of state law.' [(*In re Joint E. & S. Dist. New York Asbestos Lit.* (2d Cir. 1990) 897 F.2d 626, 631.)]"].)

jury's findings on this defense would appear to preclude liability for claims relating to the design of the boilers, it does not necessarily follow that the defense, as presented to the jury in this case, immunizes defendant from liability as to plaintiffs' failure to warn claims. Accordingly, the trial court was correct in concluding that the jury's verdict on the affirmative defense did not entitle defendant to judgment in its favor.[4]

## III. *Are the Jury Verdicts Inconsistent*

While we have concluded that the government contractor defense as articulated in the jury instructions given in this case did not immunize defendant from liability under a failure to warn theory, we are unable to conclude that the jury's verdict was based on a finding of negligent failure to warn because the special verdict form is inconsistent.[5]

---

[4] Defendant, in its reply brief, claims that the third prong of the *Tate* test is satisfied by the jury's finding on the third prong of the *Boyle* test. It further claims that the first and second prongs were satisfied by the testimony of its expert witness. While the cited testimony is relevant to these two prongs, the jury was not instructed on them, and therefore it made no factual findings. We decline defendant's implicit invitation to find that the two prongs have been established as a matter of law.

[5] Because the decision turns on the inconsistency in the jury's verdict, we set forth the entire special verdict form here:

"We, the jury in the above-entitled action, find the following Special Verdict on the questions submitted to us:

"Question No. 1: Did Foster Wheeler LLC manufacture or supply an asbestos-containing product to which Calvin Oxford was exposed?

"Yes ✓ No ___

"If you answer 'No,' do not answer any further questions. Sign, date and return this Special Verdict form.

"If you answer 'Yes,' answer the next question.

"Question No. 2: Was there a defect in the design of the Foster Wheeler LLC products?

"Yes ___ No X

"If you answer 'No,' then skip to Question No. 6.

"If you answer 'Yes,' answer the next question.

"Question No. 3: Did the design defect exist when the products left the possession of Foster Wheeler LLC?

"Yes ___ No ___

"If you answer 'No,' skip to Question No. 6.

"If you answer 'Yes,' answer the next question.

"Question No. 4: Was the design defect of Foster Wheeler LLC's products a substantial factor in causing injury, damage, loss or harm to Calvin Oxford, and thereby to plaintiffs?

"Yes ___ No ___

"If you answer 'No,' skip to Question No. 6.

"If you answer 'Yes,' answer the next question.

"Question No. 5: Was Calvin Oxford's injury, damage, loss or harm caused by a use of Foster Wheeler LLC's products that was reasonably foreseeable to Foster Wheeler LLC?

"Yes ___ No ___

"Answer the next question.

"Question No. 6: Was there a failure to warn product defect of the asbestos products involved as to defendant Foster Wheeler LLC?

"Yes ___ No ✓

"If you answer 'No,' then skip to Question No. 9.

"If you answer 'Yes,' answer the next question.

"Question No. 7: Did the failure-to-warn defect exist when the products left the possession of Foster Wheeler LLC?

"Yes ___ No ___

"If you answer 'No,' skip to Question No. 9.

"If you answer 'Yes,' answer the next question.

"Question No. 8: Was Foster Wheeler's failure to warn a substantial factor in causing injury, damage, loss or harm to Calvin Oxford, and thereby to plaintiffs?

"Yes ___ No ___

"Answer the next question.

"Question No. 9: Was Foster Wheeler LLC negligent?

"Yes ✓ No ___

"If you answer Question No. 9 'No,' and you answered 'No' to any of Question Nos. 1, 2, 3, 4 or 5 and 'No' to any of Questions 5 [sic], 6, 7 or 8, sign, date and return this Special Verdict form.

"If you answer Question No. 9 'No,' and you answered Question Nos. 5 or 8 'Yes,' answer Question No. 11.

"If you answer 'Yes' to Question No. 9, answer Question No. 10.

"Question No. 10: Was Foster Wheeler LLC's negligence a substantial factor in causing injury, damage, loss or harm to Calvin Oxford, and thereby to plaintiffs?

"Yes ✓ No ___

"If you answer Question No. 10 'No,' and you answered 'No' to any of Question Nos. 1, 2, 3, 4 or 5 and 'No' to any of Questions 5 [sic], 6, 7 or 8, and [sic] sign, date and return this Special Verdict form.

"If you answer Question No. 10 'No,' and you answered Question Nos. 5 or 8 'Yes,' answer Question No. 11.

"Question No. 11: Did the U.S. government approve reasonably precise specifications for use by Foster Wheeler LLC in manufacturing its products?

"Yes ✓ No ___

"If you answer 'No,' skip to Question No. 14.

"If you answer 'Yes,' answer the next question.

"Question No. 12: Did Foster Wheeler LLC's products conform to the specifications approved by the U.S. government?

"Yes ✓ No ___

"If you answer 'No,' skip to Question No. 14.

"If you answer 'Yes,' answer the next question.

"Question No. 13: Did Foster Wheeler LLC warn the U.S. government about those dangers of its products that were known to Foster Wheeler LLC but not to the U.S. government?

"Yes ✓ No ___

"Answer the next question.

"Question No. 14: What do you find to be the total amount of economic and non-economic damages, if any, suffered by plaintiffs?

"1. Loss of Financial Support (Past/Future)          $568,400

"2. Loss of Household Services (Past/Future)          $199,700

"3. Medical Expenses          $266,218

"4. Funeral Expenses          $5,201

"Non-economic Damages          $1,000,000

The jury was given general negligence instructions BAJI Nos. 3.10 and 3.11.[6] It was also instructed on the duty to use reasonable care to give warnings regarding the dangers associated with a product. And the jurors were instructed on a manufacturer's duty to use reasonable care in the design, manufacture, testing, and inspection of the product as well as the testing and inspection of any component parts.[7] As noted above, the jury was also instructed on products liability for design defect and failure to warn. In addition to finding that defendant had proved the three *Boyle* factors, the jury found in favor of defendant on the products liability claims and found in favor of plaintiffs on their claim of negligence.

---

"Answer the next question.

"Question No. 15: Assuming that 100% represents the total causes of plaintiffs' injury, damage, loss or harm, what percentage of this 100% is attributable to the negligence, defective products, or fault of Foster Wheeler LLC, and what percentage of this 100% is attributable to others?

| | |
|---|---|
| "Foster Wheeler LLC | 1.0% |
| "U.S. Navy | 50% |
| "All Others | 49% |
| "Total: | 100% |

"Please sign, date and return this Special Verdict form."

[6] These instructions state: "Negligence is the doing of something which a reasonably prudent person would not do, or the failure to do something which a reasonably prudent person would do, under circumstances similar to those shown by the evidence. [¶] It is the failure to use ordinary or reasonable care. [¶] Ordinary or reasonable care is that care which persons of ordinary prudence would use in order to avoid injury to themselves or others under circumstances similar to those shown by the evidence. [¶] You will note that the person whose conduct we set up as a standard is not the extraordinarily cautious individual, nor the exceptionally skillful one, but a person of reasonable and ordinary prudence." (BAJI No. 3.10.) "One test that is helpful in determining whether [or not] a person was negligent is to ask and answer the question whether or not, if a person of ordinary prudence had been in the same situation and possessed of the same knowledge, he or she would have foreseen or anticipated that someone might have been injured by or as a result of his or her action or inaction. If the answer to that question is 'yes,' and if the action or inaction reasonably could have been avoided, then not to avoid it would be negligence." (BAJI No. 3.11.)

[7] The jury was given the following instructions on negligent failure to warn: "One who supplies a product directly or through a third person for another to use, which the supplier knows or has reason to know is dangerous or is likely to be dangerous for the use for which it is supplied, has a duty to use reasonable care to give warning of the dangerous condition of the product or of facts which make it likely to be dangerous to those whom the supplier should expect to use the product or be endangered by its probable use, if the supplier has reason to believe that they will not realize its dangerous condition. A failure to fulfill that duty is negligence." (BAJI No. 9.20.)

"The manufacturer of a product that is reasonably certain to be dangerous if negligently made, has a duty to exercise reasonable care in the design, manufacture, testing and inspection of the product and in the testing and inspection of any component parts made by another so that the product may be safely used in a manner and for a purpose for which it was made. [¶] A failure to fulfill that duty is negligence." (BAJI No. 9.21.)

In addressing defendant's argument that the failure to warn verdicts are inconsistent, the trial court reasoned the jury "could have found [defendant] negligent in ways other than failing to warn or design defect." The court then observed that state law requires manufacturers to warn of a danger when it has reason to know of the danger and has no reason to know that users of the .product will be aware of the danger. The court then found "there is no showing that the federal government instructed [defendant] to provide warnings in conflict with the state tort law or to fail to provide warnings . . . that are required by state law."

## A. Inconsistent verdicts

■ General and special verdicts are deemed inconsistent when they are "beyond possibility of reconciliation under any possible application of the evidence and instructions." (*Hasson v. Ford Motor Co.* (1977) 19 Cal.3d 530, 540 [138 Cal.Rptr. 705, 564 P.2d 857] (*Hasson*), overruled in part on other grounds in *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574 [34 Cal.Rptr.2d 607, 882 P.2d 298].) "If any conclusions could be drawn thereunder which would explain the apparent conflict, the jury will be deemed to have drawn them." (*Hasson, supra,* at pp. 540–541.) Where the jury's findings are so inconsistent that they are incapable of being reconciled and it is impossible to tell how a material issue is determined, the decision is " 'against law' " within the meaning of Code of Civil Procedure section 657. (*Renfer v. Skaggs* (1950) 96 Cal.App.2d 380, 383 [215 P.2d 487].) " 'The inconsistent verdict rule is based upon the fundamental proposition that a factfinder may not make inconsistent determinations of fact based on the same evidence. . . .' [Citations.] An inconsistent verdict may arise from an inconsistency between or among answers within a special verdict [citation] or irreconcilable findings. [Citation.] Where there is an inconsistency between or among answers within a special verdict, both or all the questions are equally against the law. [Citation.] The appellate court is not permitted to choose between inconsistent answers." (*Horton, supra,* 126 Cal.App.4th 668, 682.)

Plaintiffs claim the jury's finding that there was no strict liability for failure to warn does not preclude the jury's finding of negligent failure to warn.[8] The

---

[8] The jury was instructed on failure to warn as a product defect pursuant to BAJI No. 9.00.7, as follows:

"A product is defective if the manufacturer and/or supplier of a product has a duty to warn of dangers, and fails to provide an adequate warning of that danger.

"A manufacturer and/or supplier has a duty to warn if 1) the use of the product in a manner that is reasonably foreseeable by the manufacturer and/or supplier involves a substantial danger that would not be readily recognized by the ordinary user of the product, and 2) this danger was known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of the manufacture and distribution.

trial court also appears to have concluded that the jury found defendant negligent in failing to warn. However, the jury made no specific findings as to the grounds for a negligence verdict because it was not asked to do so on the verdict form. Further, the jury was instructed on several alternative grounds on which a finding of negligence could be based, including negligent design, manufacture, testing, and inspection. It is thus not clear that the jury based its finding on negligent failure to warn.

## B. *Failure to warn*

■ As noted, the jury found the boilers were not defective with respect to their warnings. Under the "warning defect" theory of strict liability, a perfectly made product is defective if it is unreasonably dangerous to place the product in the hands of a user without a suitable warning or if no warning is given. (*Anderson v. Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 1000 [281 Cal.Rptr. 528, 810 P.2d 549].) Whether the absence of a warning makes a product defective involves several factors, including a consumer's normal expectations of how a product will perform; degrees of simplicity or complication in its operation or use; the nature and magnitude of the danger to which the user is exposed; the likelihood of injury; and the feasibility and beneficial effect of including such a warning. (*Jackson, supra,* 223 Cal.App.3d 1305, 1320.) In general, the adequacy of the warning is a question of fact for the jury. (*Ibid.*)

■ It is true that the two types of failure to warn claims are not necessarily exclusive: "No valid reason appears to require a plaintiff to elect whether to proceed on the theory of strict liability in tort or on the theory of negligence. . . . [¶] Nor does it appear that instructions on the two theories will be confusing to the jury. There is nothing inconsistent in instructions on the two theories and to a large extent the two theories parallel and supplement each other." (*Jiminez v. Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 387 [93 Cal.Rptr. 769, 482 P.2d 681].) Despite the often significant overlap between the theories of negligence and strict liability based on a product defect, a plaintiff is entitled to instructions on both theories if both are supported by the evidence. (*Hasson, supra,* 19 Cal.3d 530, 543–544.)

However, if the jury finds liability on one failure to warn theory but not on the other, the question arises whether the two findings are reconcilable.

"A manufacturer and/or supplier has a duty to provide an adequate warning to the user on how to use the product if a reasonably foreseeable use of the product involves a substantial danger of which the manufacturer and/or supplier either is aware or should be aware, and that would not be readily recognized by the ordinary user.

"A manufacturer and/or supplier has a duty to provide an adequate warning to the consumer of a product of potential risks or side effects which may follow the foreseeable use of the product, and which are known or knowable in light of the generally recognized and prevailing best scientific and medical knowledge at the time of manufacture and distribution."

Plaintiffs are correct in arguing that negligence and strict products liability are not identical doctrines. Neither doctrine entirely subsumes the other. The cases on which plaintiffs rely have reconciled findings of negligence with findings that there was no product defect. (*Hasson, supra,* 19 Cal.3d 530, 543–544; see also *Hernandez v. Badger Construction Equipment Co.* (1994) 28 Cal.App.4th 1791, 1828 [34 Cal.Rptr.2d 732] (*Hernandez*).) On the other hand, such findings are not necessarily consistent; and other cases on which defendant relies have found such findings to be irreconcilable. (*Valentine v. Baxter Healthcare Corp.* (1999) 68 Cal.App.4th 1467, 1481–1482 [81 Cal.Rptr.2d 252] (*Valentine*); *Lambert v. General Motors* (1998) 67 Cal.App.4th 1179, 1186 [79 Cal.Rptr.2d 657] (*Lambert*).) These cases are not themselves at odds, but reflect the common view that whether the verdicts can be reconciled depends on the precise instructions that were given and the particular evidence that was before the jury.

In *Lambert*, for example, the court held that a jury finding of negligence was irreconcilable with a finding that there was no design defect in the defendant's automobile. There, "the record disclose[d] no evidence of negligence except negligent design." (*Lambert, supra,* 67 Cal.App.4th 1179, 1185.) "If the design of the Blazer was not defective," the appellate court explained, "General Motors could not be deemed negligent. The jury could not have concluded that General Motors negligently designed the Blazer and at the same time conclude that it was not defective. [Citation.] Therefore, the inconsistent verdicts are irreconcilable." (*Id.* at p. 1186.)

Similarly, in *Valentine*, the appellate court held that a finding by one jury that the defendant's product was not defective because of a failure to warn precluded a second jury from finding that the defendant was negligent for failing to warn of the risks of its product. The plaintiff there argued that in finding no product defect for failure to warn, the jury had determined only that the product was not defective as of the time that the product, silicone gel, was implanted in the plaintiff's wife's breasts, while a jury might yet consistently find that the defendant was negligent in not thereafter issuing a warning when the potential risks and side effects of such implants became known. (*Valentine, supra,* 68 Cal.App.4th 1467, 1482.) The court implicitly recognized that if the instructions on the strict liability failure to warn had limited the first jury's consideration to the period prior to the implantation, a negative finding would not have been inconsistent with a finding of negligence thereafter. However, in the first trial the jury had been told that the strict liability duty to warn was continuous, extending as long as the product was in use. Therefore, a finding that the defendant was negligent in failing to issue a warning after the implantation would have been inconsistent with, and was precluded by, the finding that there was no defect for failure to warn. (*Id.* at pp. 1481–1482.) The court held that "the negative finding on strict

liability failure to warn . . . subsumed the negligent failure to warn theory and thus exonerated [defendant] of *any* liability for failure to warn." (*Id.* at p. 1480.)

In contrast, in *Hasson*, the Supreme Court upheld a verdict of negligence against an automobile manufacturer despite the jury's finding that there was no defect in the car, the brakes of which failed, causing an accident and serious injuries to the plaintiff. In that case, there was evidence that the car's brake system was not defective at the time the automobile entered the market, but failed as a result of conditions present at the time of the accident. (*Hasson, supra,* 19 Cal.3d 530, 536–537.) The court held that the verdicts were not inconsistent, reasoning, "Faced with the two separate theories, advanced in argument, and supported by instructions, the jury may have concluded that the braking system and the fluid were, at the outset, sound and fit for their intended purpose, but that Ford was nonetheless liable for its failure during the ensuing four years to warn of conditions which might develop in use." (*Id.* at p. 543.) Thus, based on "the posture in which [the] case went to the jury" (*id.* at p. 540), the jury's findings could be reconciled.

Similarly, in *Hernandez,* the appellate court found that the jury's finding that there was no design defect in a construction crane when it left the possession of the manufacturer without a particular safety device was not inconsistent with another finding that the manufacturer was nonetheless negligent. There, the record contained evidence supporting a finding of negligence on the theory that when the manufacturer subsequently became aware of the need for the safety device, it failed to conduct an adequate retrofit campaign. (*Hernandez, supra,* 28 Cal.App.4th 1791, 1827–1828.) The court relied on the earlier decision in *Lunghi v. Clark Equipment Co.* (1984) 153 Cal.App.3d 485, 494 [200 Cal.Rptr. 387] (*Lunghi*), in which the court held there was no inconsistency between a finding that there was no defect in the design of a product and a finding that the manufacturer was negligent in failing to issue warnings and conduct an adequate retrofit campaign when it later learned of the dangerous propensities of the product.

In answering special verdict question No. 6 "no," the jury in the present case found explicitly that under California products liability law the boilers were not defective with respect to warnings. Consequently the finding of negligence can be reconciled only if the record reveals some other basis on which the jury, under the court's instructions, could have found defendant to have been negligent. Our close scrutiny of the record, reveals a plausible explanation for the differing findings. Plaintiffs' counsel was clear that plaintiffs were asserting product defects and negligence as separate claims,

and it appears that plaintiffs were relying on different facts to establish the separate theories. In particular, counsel argued defendant was negligent in its testing of the boilers.[9]

■ The negligent testing theory, however, would be inconsistent with the jury's finding for defendant on liability for design defect. Even if defendant failed in this respect, there could be no causation of injury or recovery for such failure if there was no defect in the product. "Presumably, the reason that manufacturers are under a duty to test their products is to discover defects or dangers associated with [the] use of the products. . . . [¶] . . . [U]nless the manufacturer's breach of its duty to test leads the manufacturer to produce a product that is defective in design, manufacture, or warning, no injury can result. If the manufacturer designs the product safely, manufactures the product safely, and provides an adequate warning of dangers inherent in the use of the product, then a failure to test the product cannot, standing alone, cause any injury." (*Kociemba v. G.D. Searle & Co.* (D.Minn. 1989) 707 F.Supp. 1517, 1527.)

We conclude a finding of negligent failure to warn is logically and legally inconsistent with the jury's finding on plaintiffs' strict products liability failure to warn. And, while we agree with the trial court's conclusion that the jury could have found defendant negligent in ways other than failure to warn or design defect, the jury's verdict with respect to the government contractor defense would serve as an absolute defense to such tort claims. Apart from the failure to warn context, our research has not uncovered any exceptions to the *Boyle* defense for negligent acts or omissions related to the manufacture and design of a product made under specification of the United States government. Accordingly, to the extent the jury might have found defendant

---

[9] Plaintiffs' closing argument on the issue of defendant's negligence included the following: "Testing the component parts of others. The Johns-Manville, the Raybestos-Manhattan asbestos boiler/block insulation, rope, gaskets on these boilers—Foster Wheeler's duty. *A failure to fulfill that is negligence.* [¶] You can *also* be negligent in the way you fail to warn. . . . If you supply a product through someone else for another to use, you have a duty to use reasonable care to give the warning of the dangerous condition of the product or the facts which make it likely to be dangerous to those to whom the supplier would expect to use the product or be endangered by its probable use. [¶] If you're a boiler manufacturer selling boilers with asbestos to the Navy, who do you think meets that description? Firemen. BT-3's. BT-2's. Boilermakers. Every guy on the Klondike, right there. [¶] Do you think Foster Wheeler doesn't know who's likely to be endangered by the probable use of its boilers? Of course they know. There's [*sic*] no surprises here, folks. A failure to fulfill that duty is negligence." (Italics added.)

Earlier in his argument, counsel stated: "And folks, I'm here to argue to you and emphasize to you in my view, *if someone doesn't test their products as a product manufacturer, they're negligent.* As you're going to be given the instruction, they failed to discharge a duty of ordinary care to avoid injury to others. It's exactly what the instruction is going to say that the judge is likely to give you. I think that's a good example, among many, of the dangers and negligence on behalf of Foster Wheeler." (Italics added.)

negligent for something other than failure to warn, that claim would have been barred by the affirmative defense.[10]

We also note that plaintiffs did not claim defendant had a continuing duty to warn about dangers that it might have discovered after the boilers were manufactured. While negligence of a manufacturer may be established by a failure to act after the product has been distributed to its end user (see, e.g., *Hernandez supra*, 28 Cal.App.4th 1791; *Lunghi, supra*, 153 Cal.App.3d 485), the negligence instructions in this case, though not explicitly excluding this possibility, told the jury nothing of any duty on defendant's part to issue new warnings or recall a product that had already been sold. At no point in the argument to the jury did counsel ever suggest that a finding of negligence could or should be based on defendant's failure to take any action after its boilers had been sold.

Finally, the trial court here distinguished *Valentine* because the jury in the present case had made "no specific finding that [defendant] did actually warn." However, the jury necessarily found that defendant did not fail to provide adequate warnings when it found against plaintiffs on the products liability failure to warn claim. If the jury further found that defendant provided no warnings at all, its verdict on this claim suggests either that no such warnings were necessary, or, alternatively, that the warnings could not have been provided when the boilers were manufactured, given the state of medical and scientific knowledge at that time.

■ In sum, a careful review of the record thus discloses no explanation of how the jury might have found defendant negligent for failure to warn while also finding that the product was not defective with respect to its warnings. The jury's verdict is reconcilable, however, if the jury found defendant negligent in some other aspect, such as negligent testing. However, such a finding would have been inconsistent with the finding that the product was not defectively designed, and would also be barred by the government contractor defense. Accordingly, the verdict is hopelessly inconsistent.

"Inconsistent verdicts are ' "against the law," ' and the proper remedy is a new trial." (*Shaw v. Hughes Aircraft Co.* (2000) 83 Cal.App.4th 1336, 1344

---

[10] In an effort to harmonize the jury's findings, plaintiffs attempt to divorce the "repair and maintenance" of a product from the "use" of a product. They claim that the general jury instructions on negligence (BAJI Nos. 3.10 & 3.11) allowed the jury to conclude that defendant could have "prevented [Oxford's] exposure to hazardous asbestos fibers by taking the reasonable and easy step of attaching a warning to its boilers." They also claim negligent failure to warn of the foreseeable consequences of repair or maintenance to the boiler, and its asbestos-containing parts, was not necessarily encompassed by BAJI Nos. 9.00.7 and 9.20. We believe it is "reasonably foreseeable" that products such as boilers will need to be repaired and maintained (see BAJI No. 9.00.7). We thus fail to see how the jury could have drawn the distinction advanced by plaintiffs.

[100 Cal.Rptr.2d 446]; see Code Civ. Proc., § 657, subd. 6.) Under the circumstances we must conclude that there is an irreconcilable inconsistency in the verdicts as to defendant's liability, and therefore that none of these verdicts may stand.[11] As we have concluded that this case must be remanded for new trial, we need not address defendant's claim of instructional error.

## DISPOSITION

We reverse and remand for a new trial in a manner consistent with this opinion. (Code Civ. Proc., § 657, subd. 6; *Lambert, supra,* 67 Cal.App.4th 1179, 1186.) Costs on appeal are awarded to appellant.

Marchiano, P. J., and Margulies, J., concurred.

A petition for a rehearing was denied September 30, 2009, and respondents' petition for review by the Supreme Court was denied December 2, 2009, S177221. Corrigan, J., did not participate therein.

---

[11] Plaintiffs' claim that defendant invited error by proposing a verdict form that included dual theories for failure to warn is not well taken. Plaintiffs requested that the jury be instructed on both theories, and the verdict form conforms to their requested instructions.